J-S38012-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JUDY LEE SPRANKLE | : | |
| | : | |
| Appellant | : | No. 1020 WDA 2017 |

Appeal from the PCRA Order June 13, 2017
In the Court of Common Pleas of Jefferson County Criminal Division at
No(s): CP-33-CR-0000455-2011

BEFORE: BOWES, J., NICHOLS, J., and STRASSBURGER*, J.

MEMORANDUM BY BOWES, J.: FILED NOVEMBER 30, 2018

Judy Sprankle appeals from the order denying her PCRA petition seeking relief from her guilty plea to, inter alia, attempted murder. For the reasons that follow, we find that counsel had a reasonable strategic basis for advising Appellant to plead guilty, and affirm.

The plea resulted from Appellant firing a gun at a vehicle occupied by her ex-husband Elmer Sprankle, and his girlfriend Alicia Caltagarone. These actions represented the culmination of a lurid history of marital and familial strife. Appellant asserts that, at the time of the shooting, she was acting in self-defense as a result of battered woman syndrome ("BWS") and/or post-traumatic stress disorder ("PTSD"). She challenges the effectiveness of her trial counsel for failing to adequately develop the evidence supporting those diagnoses, and, in turn, failing to advise Appellant to take her case to trial and raise that defense.

_____

* Retired Senior Judge assigned to the Superior Court.

Appellant was initially charged with thirteen crimes: two counts each of attempted homicide, attempted aggravated assault, and criminal mischief; three counts each of recklessly endangering another person ("REAP") and simple assault; and one count of discharging a firearm into an occupied structure ("DFOS"). Appellant accepted a plea to one count of attempted homicide (Elmer Sprankle), one count of REAP (Alicia Caltagarone), and DFOS. There was no agreement as to sentence, and the trial court ultimately imposed an aggregate sentence of eight to twenty-nine years incarceration.

We affirmed judgment of sentence on direct appeal. Commonwealth v. Sprankle, 2014 WL 10915447, at *1 (Pa.Super. 2014) (unpublished memorandum). Appellant sought review with our Supreme Court, which denied her petition on November 26, 2014. Commonwealth v. Sprankle, 104 A.3d 4 (Pa. 2014).

Appellant thereafter filed a timely PCRA. We add the following facts, which are necessary for review of the current claim. The affidavit of probable cause prepared by Pennsylvania State Police Trooper John Young states that on September 8, 2011, Elmer Sprankle and Alicia Caltagarone arrived at a magisterial office for a hearing.[1] Appellant was standing on the porch of the building, and as Elmer parked his vehicle, Appellant stated, "Hi honey, come on inside, I'm going to kill you." Affidavit of Probable Cause, 9/15/11, at

_____

[1] The parties were there for a harassment charge, with Appellant as the defendant and Elmer as the complainant.

- 2 -

unnumbered 10. Appellant approached the passenger side and took a swing at Ms. Caltagarone through the window. Elmer drove away, and Appellant reached into her purse and retrieved a handgun. She fired at the vehicle several times. Trooper Young "observed what appeared to be a bullet dent in the rear trunk lid" of Elmer's vehicle. Id.

Corporal Jeffrey Lee and Trooper Robert Means confronted Appellant, who was walking in a nearby alley. She complied with the order to drop her weapon, which was taken into custody.[2] As Trooper Means placed her under arrest, Appellant stated, "Take it easy it[']s not you I'm going to hurt it's my husband I'm going to kill." Id. Troopers Young and Richard Lorelli then transported Appellant to the barracks. During the ride, she remarked, "Don't let me out of jail because I'll kill him. You can write that down. He molested my daughter, I'll kill him. I think they are safe now." Id.

On October 11, 2011, trial counsel filed a motion seeking funds for the appointment of an expert. The document states, in pertinent part:

> Counsel has interviewed [Appellant], has studied the records in this case as well as in other matters arising out of the dissolution of [Appellant]'s marriage to Elmer Aaron Sprankle and has also studied the records arising out of a Protection From Abuse action filed by the daughter of Elmer Aaron Sprankle against him and believes that [Appellant] is a battered wife and that the appointment of a psychiatrist is essential to the preparation of the defense in this case.

_____

[2] The firearm was a Smith & Wesson revolver with a capacity of six rounds. Examination "revealed that all [six] rounds were fired." Id.

The preparation of an adequate defense for [Appellant] requires that counsel be accurately apprised of the nature of [Appellant]'s mental health at the time of the crime and at the present time, and be able to consult with and, if necessary, have available at trial a psychiatrist engaged in [Appellant]'s behalf.

An independent psychiatrist is necessary in this case to determine if [Appellant] suffers from battered wife syndrome or other mental illness that would bear upon her mental capacity to understand the nature of the acts complained of and to otherwise participate in the proceedings.

Motion, 10/11/11, at unnumbered 2-3 (paragraph numbers omitted). That motion was denied on March 19, 2012, on the ground that by order entered February 17, 2012, Appellant and Elmer had reached an agreement to divide marital assets and "[Appellant] now ha[s] assets by which she can employ a psychiatrist[.]" Order, 3/19/12, at 1.

On September 7, 2012, the Commonwealth filed a motion in limine to exclude evidence at trial. The Commonwealth stated that "[Trial counsel] provided the Commonwealth with a summary of a psychiatric report of an evaluation . . . by Joseph S. Silverman, M.D." Motion, 9/7/12, at 1. The Commonwealth filed the motion out of an abundance of caution, seeking exclusion of Dr. Silverman's testimony in the event the matter went to trial, as Appellant had not filed a notice of intent to present a defense of insanity or mental infirmity.

That same day, the District Attorney, Jeffrey D. Burkett, sent a plea offer letter acknowledging his receipt of Dr. Silverman's report. The letter expressed Attorney Burkett's belief that Appellant intended to kill Elmer.

- 4 -

"[A]fter reading through the police report and reading the many, many statements [Appellant] made to the police on September 8, 2011, I am absolutely convinced that [Appellant] fully intended to kill Elmer Sprankle that day." Amended PCRA Petition, 8/3/16, Exhibit 17. Simultaneously, the Commonwealth acknowledged that Appellant's and Elmer's "history appears to be so ugly" and proposed one of two possible pleas. Id. The first was a plea to attempted homicide of Elmer Sprankle, recklessly endangering another person (Ms. Caltagarone), and DFOS, with an aggregate sentence of ten years and seven months to twenty-six years incarceration. Alternatively, the Commonwealth agreed to permit Appellant to plead to those three charges and withdraw the remaining counts, with no agreement as to sentence.[3]

Appellant opted for the open plea agreement, and sentencing was set for September 18, 2012. Counsel called four witnesses on Appellant's behalf: K.C., the biological daughter of Appellant and Elmer; K.C.'s husband, William; Dr. Silverman; and Appellant's fiancé, James Schutz.

K.C. testified that Elmer had a history of abuse towards her and Appellant. Elmer was "very mean to us and cruel. I witnessed him punching her (Appellant) in the face, slapping her." N.T. Sentencing, 9/18/12, at 9. Elmer killed a few of the family pets. He pointed a gun at Appellant,

_____

[3] The letter was attached to Appellant's amended PCRA as an exhibit. The Commonwealth agreed during the first evidentiary hearing that the letter was sent. N.T., PCRA Hearing I, 9/9/16, at 62.

threatening to not only kill her if she ever left him, but the children as well. Id. at 11-12. One day, while hiding under a bed, she heard Elmer rape Appellant. Id. at 24. In May of 2011, K.C. filed for a PFA against Elmer, as she did not want him around her child due to his history of abuse.

Her testimony also shed light on Appellant's statement to police that Elmer molested their daughter. When K.C. was quite young, she recalled Elmer telling her to stand up in the bathtub. He then "wash[ed] me roughly in my private area and said, 'You're a dirty girl.'" Id. at 13. K.C. did not tell Appellant of the abuse until after she received the PFA order against Elmer. On cross-examination, K.C. agreed that she was having discussions with Appellant about these matters around the time that she filed for the PFA order. She also agreed that Appellant had called the police on Elmer on several occasions and conceded that, on some occasions, Appellant was charged as the aggressor.

With regards to the shooting on September 8, 2011, the Commonwealth asked K.C. if she had told Appellant any "bombshell information" on or around the day of the hearing that would have enflamed Appellant. K.C. conceded that she had not, but indicated that Appellant had spoken to K.C.'s husband sometime before the shooting and was extremely upset. The husband testified to that conversation and related that, after the PFA hearing, Appellant stayed with him and K.C. She appeared guilt ridden and told him, "Elmer called me at work and said that I f***ed your daughter." Id. at 33-34.

- 6 -

Appellant, visibly upset and crying, asked, "What do you think he meant? Do you think he meant financially?" Id. at 34.

Doctor Silverman testified that Appellant was "showing the effects of [forty] years of stress, extreme stress." Id. at 52. Appellant was under a lot of stress from their marriage, and, upon finding out in June of 2011 about Elmer's history of abuse towards their children, she felt like a failure for not protecting her family. Id. at 53. He opined that Appellant "was driven to an extreme measure . . . I think she reached a limit, and what happened, happened." Id. at 57. He additionally noted that Elmer had, on the day of the shooting, leaned out the window and yelled, "I'll get [J]" and/or "I f***ed your daughter." Id. at 58.[4] Hearing those statements "intensified her determination to do something then." Id. Neither BWS nor PTSD was mentioned during his testimony.

The aforementioned report prepared by Dr. Silverman was introduced as an exhibit, which offered more historical background information and cataloged a litany of abusive and controlling behavior by Elmer, including physical assaults, broken ribs, punches to the face, calling Appellant fat and lazy, and tracking the mileage on her car to keep track of her movements. Regarding the day of the shooting, Dr. Silverman offered the following factual recitation:

_____

[4] [J] refers to K.C.'s child.

On the day of the shooting, September 8, 2011, [Appellant] felt "scared." It seemed to her that there could be no peace for her, for her daughter, for her grandson. She felt she had a duty to protect her loved ones. To restore her courage, she drove to the magistrate's office with a handgun in her purse. (Her son had presented the weapon to her in 2009 for self-protection.) She fell into a serene, de-emotionalized state, similar to anxiety-induced depersonalization.

When interviewed by this examiner, [Appellant] denied use of alcohol that morning. She also denied practicing shooting the weapon that she carried to the hearing.

The firing of that six-shot handgun [she] remembers dimly, in a dreamlike, slow-motion way. Police descriptions of [Appellant] and her behavior suggest that she was disinhibited and uncalculating. . . .

[Appellant] remembers seeing Elmer's Chevrolet backing up in her direction, the red brake lights glowing. She does not recall thinking that Elmer was trying to run her over. According to the police report, [Appellant], while handcuffed, continued to make threats to kill her husband.

Report at unnumbered 2-3 (emphasis added). In the section of the report devoted to opinion, Dr. Silverman opined:

The way serenity suddenly swept over [Appellant] suggests that, on the day of the shooting, she fell into an atypical state. She had resolved to take some kind of action to liberate herself and the whole family from the persecution they had all suffered as a result of Elmer's malignant, unrelenting intrusiveness, unrelenting even after he found himself a new partner.

Anxiety, on occasion, can spawn an irresistible commitment to action that, as in this case, can be automatically succeeded by a state of exceptional calm.

Id. at 5. On cross-examination, Dr. Silverman agreed that his opinions were based on the history presented by Appellant and her children.

As stated above, Appellant was sentenced to eight to twenty-nine years incarceration, which was affirmed on appeal.

As noted, Appellant filed a timely PCRA petition. That document was followed by an amended PCRA petition. The PCRA court held an evidentiary hearing on September 9, 2016, and heard testimony from Appellant and trial counsel. The hearing was limited to the claim raised in the supplemental PCRA petition, which asserted that the plea was involuntary.[5]

Following that hearing, Appellant filed a supplemental amended PCRA petition, in which she represented that, "In early October 2016, [Appellant] and her family retained Dr. Victoria Reynolds, a well-respected and experienced psychologist who specializes in . . . post-traumatic stress disorder ("PTSD")." Supplemental PCRA Petition, 3/1/17, at unnumbered 1. The petition states that Dr. Reynolds evaluated Appellant over the course of

_____

[5] The claim read in full:

> [Counsel]'s legal advice to [Appellant] before and during [Appellant]'s oral plea colloquy was incomplete, inadequate, wrong, and objectively unreasonable under professional standards. [Appellant] based her decision to plead guilty to attempted murder, REAP, and DFOS on [counsel]'s incomplete, inadequate, wrong, and objectively unreasonable advice. Had [Appellant] been adequately, completely, and accurately advised regarding the relevant Pennsylvania law regarding each offense, [Appellant] would not have pled guilty to attempted murder, REAP, and DFOS. [Appellant]'s guilty plea, therefore, is unknowing and unintelligent, meeting the manifest injustice standard to have her plea vacated.

Amended PCRA Petition, 8/3/16, at 26.

approximately fifteen hours, interviewed family members, and examined related case materials. Appellant linked Dr. Reynold's findings to her entitlement to relief as follows:

> Based on Dr. Reynolds' findings and conclusions, it is clear [Appellant]'s PTSD and brain-circuitry prevented her from acting with specific intent and premeditation on September 11, 2011. Dr. Reynolds' findings and conclusions, moreover, could have been easily developed and identified before September 10, 2012-the day [Appellant] pled guilty. This is critical because [counsel] advised [Appellant] to plead guilty to attempted homicide, which is a specific intent crime. Had [counsel] performed effectively and developed the facts and conclusions contained in Dr. Reynolds' affidavit before [Appellant] pled guilty, [Appellant] would not have pled guilty to attempted murder.

Id. at 2 (emphases in original).

The PCRA court held a second hearing to consider Dr. Reynolds' testimony. The parties submitted post-hearing briefs, and the PCRA court denied the petition by joint order/opinion docketed June 13, 2017. Appellant filed a timely notice of appeal, and the court ordered a Pa.R.A.P. 1925(b) concise statement of errors. Appellant complied,[6] and the PCRA court's Pa.R.A.P. 1925(a) opinion largely adopted the June 13, 2017 opinion. The matter is now ready for review of the following issue.

> The record does not support the PCRA court's findings regarding [counsel]'s representation of [Appellant]. [Counsel]'s representation was objectively unreasonable. She failed to develop readily available evidence regarding [Appellant]'s severe

_____

[6] Appellant inadvertently failed to file the concise statement within twenty-one days as required by the Pa.R.A.P. 1925(b) order. Appellant petitioned the PCRA court for reinstatement of the right to appeal nunc pro tunc, which was granted.

PTSD and how it impacted her perceptions, decision -making, and brain circuitry. [Counsel]'s deficient representation prejudiced [Appellant]. There is a reasonable probability had [counsel] developed the readily available PTSD facts contained in Dr. Reynolds's affidavit and testimony and properly advised [Appellant] this evidence could form the foundation of legitimate self-defense and diminished capacity defenses at trial, [Appellant] would have pled not guilty and proceeded to a jury trial.

Appellant's brief at 5.

Our standard of review examines "whether the PCRA court's determination is supported by the evidence of record and free of legal error. We grant great deference to the PCRA court's findings, and we will not disturb those findings unless they are unsupported by the certified record." Commonwealth v. Holt, 175 A.3d 1014, 1017 (Pa.Super. 2017) (citation omitted). Credibility findings are binding where supported by the record. Commonwealth v. Dennis, 17 A.3d 297, 305 (Pa. 2011).

In reviewing a claim that counsel was constitutionally deficient, "we begin with the presumption [that] counsel is effective." Commonwealth v. Cousar, 154 A.3d 287, 296 (Pa. 2017) (citation omitted). To succeed, Appellant must establish, by a preponderance of the evidence, that "(1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) appellant suffered prejudice as a result of counsel's error[.]" Commonwealth v. Domek, 167 A.3d 761, 764 (Pa.Super. 2017). "A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim." Commonwealth v. Daniels, 628 Pa. 193, 218, 104 A.3d 267, 281 (Pa. 2014) (citation omitted).

- 11 -

Where counsel's advice to accept or reject a plea offer is at issue, the following principles inform our review.

> A criminal defendant has the right to effective counsel during a plea process as well as during a trial. Hill v. Lockhart, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). Allegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused the defendant to enter an involuntary or unknowing plea. Commonwealth v. Allen, 557 Pa. 135, 732 A.2d 582 (1999). Where the defendant enters his plea on the advice of counsel, "the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" Hill, 474 U.S. at 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (quoting McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)).

Commonwealth v. Robinson, 185 A.3d 1055, 1063 (Pa.Super. 2018) (en banc) (citation omitted).

We find that Appellant has failed to establish the second prong of the ineffectiveness test. Our review of the record demonstrates that counsel had a reasonable strategic basis for recommending that Appellant accept the plea. Thus, we need not determine whether Appellant made the requisite showing for prejudice.[7]

_____

[7] Appellant maintains that the prejudice showing would establish a reasonable probability that she would have opted for trial. However, in Hill v. Lockhart, 474 U.S. 52 (1985), the High Court stated that the prejudice showing in such cases requires some objective analysis of the likelihood of the defense succeeding at trial.

> [W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely

As the High Court made plain in Strickland v .Washington, 466 U.S. 668 (1984), counsel's strategic decisions must be examined in light of the known facts and what prevailing professional norms required at the time of the plea.

> [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.

Id. at 690.

Preliminarily, we note that Appellant has largely abandoned the claim pursued at the first evidentiary hearing, as she no longer claims that counsel

_____

> on whether the affirmative defense likely would have succeeded at trial.  See, e.g., Evans v. Meyer, 742 F.2d 371, 375 (CA7 1984) ("It is inconceivable to us … that [the defendant] would have gone to trial on a defense of intoxication, or that if he had done so he either would have been acquitted or, if convicted, would nevertheless have been given a shorter sentence than he actually received").  As we explained in Strickland v. Washington, [466 U.S. 668 (1984)], these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the "idiosyncrasies of the particular decisionmaker."  Id., 466 U.S. at 695, 104 S.Ct., at 2068.

Id. at 59–60 (emphasis added).

failed to explain the elements of the crime and that her plea was involuntary as a result. Instead, Appellant's argument pivots by emphasizing Dr. Reynolds's testimony, which includes the following disclaimer:

> To be clear, this claim is not an ineffectiveness claim regarding [counsel]'s failure to retain a qualified PTSD/BWS expert. [Counsel] retained Dr. Silverman who evaluated [Appellant], produced two reports, and testified at the sentencing hearing. Dr. Silverman, therefore, did what he was asked to do. Thus, his inability to develop the readily available PTSD/BWS findings and conclusions developed by Dr. Reynolds is not his fault.
>
> The fault falls squarely on [counsel]'s shoulders. She—not Dr.Silverman—had a constitutional duty to adequately investigate [Appellant]'s case and develop all readily available evidence that mitigated or undermined the Commonwealth's claim [Appellant] intended to kill Elmer on September 8, 2011. There is simply no reasonable excuse why [counsel] failed to develop the readily available PTSD/BWS evidence Dr. Reynolds developed in 2016. The PTSD/BWS evidence Dr. Reynolds developed did not materialize after Ms. Sprankle pled guilty in September 2012. Rather, it materialized and was readily identifiable well before September 2011.
>
> This claim, therefore, is a straightforward ineffectiveness claim alleging [counsel] failed to develop readily available evidence (1) regarding the severity of [Appellant]'s PTSD, (2) how years of stress and trauma impacted her brain's neuropathways, (3) how her reconfigured neuropathways impacted her decision -making and perception of the world, and (4) how her actions on September 8, 2011 were the result of a limbic-driven, dissociative, fight or flight mental state and not a cortical-driven, rational, deliberative mental state.

Appellant's brief at 59-60 (second emphasis added, all others in original).

Appellant thus alleges that trial counsel failed to adequately research and develop the "readily available" evidence, which led Appellant to conclude

- 14 -

that counsel was misinformed, and, therefore, Appellant was likewise misinformed. Hence, the plea was unknowing and involuntary.

Our examination of Appellant's argument compels our conclusion that Appellant is alleging precisely what she disavows. The attempt to assert that plea counsel supplied deficient advice must be recognized for what it is: a failure to consult the right expert, who would have better supported the potential self-defense claim based on PTSD and/or BWS. Consider her argument that the evidence presented at the evidentiary hearing was readily-available to trial counsel:

> Based on [counsel]'s misadvice, Ms. Sprankle believed no evidence existed to counter or undermine the Commonwealth's claim she intended to kill Elmer on September 8, 2011. This misinformed belief is obviously wrong. The readily available PTSD/BWS evidence strongly suggests Ms. Sprankle did not rationally contemplate her actions on September 8, 2011, and, therefore, did not intend to kill Elmer. Rather, it suggests she was in a limbic induced, dissociative, fight or flight mental state when she fired at Elmer's car. Thus, had Ms. Sprankle been properly advised regarding the PTSD/BWS evidence, self-defense, and diminished capacity, it is reasonably probable she would have pled not guilty, proceeded to a jury trial, and presented a self-defense defense, a diminished capacity defense, or both.

Appellant's brief at 61-62.

By stating Appellant was not "properly advised," she places the onus on trial counsel to develop the facts, who in turn would advise Appellant regarding her options in light of those facts. "Here, had [Appellant] known of the PTSD/BWS facts developed by Dr. Reynolds before she pled guilty and known that these facts could have formed the foundation of a legitimate self-

- 15 -

defense claim, [Appellant] would not have pled guilty." Appellant's brief at 69. Appellant would only learn these facts through her counsel. Yet Appellant explicitly states that she is not faulting counsel for failing to consult and retain Dr. Reynolds.

These positions are incompatible with Strickland. That case cannot be read to require attorneys to ascertain, in the course of applying their legal knowledge, whether their clients' actions "were the result of a limbic-driven, dissociative, fight or flight mental state and not a cortical-driven, rational, deliberative mental state." Appellant's brief at 60. Trial counsel hired an expert, Dr. Silverman, and consulted with him. The reasonableness of her advice must be assessed in light of what the expert told her. See Commonwealth v. Brown, 2018 WL 5046812, at *15 (Pa. Oct. 17, 2018) ("[T]his Court has ruled that courts may not conflate the roles and professional obligations of experts and lawyers by demanding that counsel spot 'red flags' when the mental health expert they hired failed to do so.").

Just as a defendant need not be apprised of every possible suppression motion as a predicate to a finding that the plea was voluntary, see Commonwealth v. Johnson, 179 A.3d 1153 (Pa.Super. 2018), the same is true regarding the details of a self-defense claim. Appellant did not need an

attorney to tell her that she feared for her life, even if she needed an expert to explain to the jury why that thought process was reasonable.[8]

None of this is to say that the Commonwealth's evidence of attempted first-degree homicide was overwhelming, or that a self-defense claim was doomed to fail. Our point is simply that Strickland allocates to counsel the burden of assessing the wisdom of taking a plea versus the risk associated with going to trial in light of all the known facts and circumstances. We find that Appellant has failed to establish that trial counsel's advice was not within the range of competency demanded.

Order affirmed.

Judge Strassburger joins the memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/30/2018

_____

[8] Appellant more or less contends that counsel was ineffective for failing to convince her that she acted in self-defense, due to PTSD / BWS. Yet how Appellant felt and what she believed at the moment of the shooting was surely known to her.

In this respect, Appellant fails to acknowledge that Dr. Silverman's report states Appellant "does not recall thinking that Elmer was trying to run her over." See supra, at 8. If Appellant relayed the same to trial counsel, that fact obviously undercuts any self-defense claim.